# In the United States Court of Federal Claims
**OFFICE OF SPECIAL MASTERS**
No. 19-1970V
UNPUBLISHED

| | |
|---|---|
| MEGAN SWANZER,<br><br>      Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>      Respondent. | Chief Special Master Corcoran<br><br>Filed: February 3, 2022<br><br>Special Processing Unit (SPU); Ruling on Entitlement; Finding of Fact; Statutory Severity Requirement; Six Months' Sequelae; Ruling on Entitlement; Tetanus-Diphtheria-Acellular Pertussis (Tdap); Shoulder Injury Related to Vaccine Administration (SIRVA). |

*Bobbie L. Flynt, Crandall & Pera Law, LLC, Chagrin Falls, OH,* for Petitioner.

*Jennifer Leigh Reynaud, U.S. Department of Justice, Washington, DC,* for Respondent.

## RULING ON ENTITLEMENT[1]

On December 30, 2019, Megan Swanzer filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleges that as a result of the tetanus-diphtheria-acellular pertussis ("Tdap") vaccine she received on March 4, 2018, she suffered a shoulder injury related to vaccination ("SIRVA") as defined on the Vaccine Injury Table (the "Table").

---

[1] Because this unpublished opinion contains a reasoned explanation for the action in this case, I am required to post it on the United States Court of Federal Claims' website in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services). **This means the opinion will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

Petition (ECF No. 1) at Preamble. The case was assigned to the Special Processing Unit of the Office of Special Masters.

For the reasons discussed below, I find that Petitioner most likely suffered the residual effects of her alleged SIRVA for more than six months, and that she is otherwise entitled to compensation.

**I.     Relevant Procedural History**

The petition was initially supported by some documentation, including of one encounter with an orthopedist, Reuben Gobezie, M.D. at the Cleveland Shoulder Institute in 2019. Ex. 2. Petitioner also recalled an earlier encounter with Dr. Gobezie on March 21, 2018 – close in time to the vaccination deemed causal - but neither Dr. Gobezie nor the Cleveland Shoulder Institute possessed records from Dr. Gobezie's prior practice from that time. Ex. 1; ECF Nos. 13, 17. Petitioner was unsuccessful in serving an authorized subpoena onto the prior practice's address. *See* Status Report filed June 1, 2020 (ECF No. 23) (including FedEx tracking information). Thus, she offered other non-medical evidence to corroborate the March 21, 2018 encounter. Exs. 8-9, 11-12.

During a July 21, 2020, status conference, however, I observed that Petitioner could likely establish the statutory severity requirement despite the missing records and the acknowledged gap in treatment between March 2018 and May 2019. ECF No. 28.[3] I therefore proposed the parties consider settlement. To that end, Petitioner conveyed a demand to Respondent on September 11, 2020, but further settlement discussions did not occur. ECF Nos. 32, 34-36.

Almost a year later, on June 22, 2021, Respondent filed his Rule 4(c) Report opposing compensation, arguing that six-months of post-injury severity could not be established because "Petitioner has failed to show that the right shoulder complaints she was treated for in March 2018 were related to the complaints she made well over a year later in May 2019." Rule 4(c) Report (ECF No. 38) at 5. On October 13, 2021, Petitioner filed a brief maintaining that her injury had lasted for more than six months. Brief (ECF No. 41).[4] On November 19, 2021, Respondent filed his Response (ECF No. 44). On December 7, 2021, Petitioner filed her Reply (ECF No. 45). The matter is now ripe for adjudication.

---

[3] This gap in treatment was first noted by the assigned staff attorney, and acknowledged by Petitioner, during the initial status conference on February 6, 2020. *See* ECF No. 12. Afterwards, Petitioner filed supplemental affidavits addressing the issue on April 1, 2020, and July 14, 2020. Exs. 6, 10.

[4] On the same date, Petitioner filed her fourth and final affidavit. Ex. 14.

## II.    Issue

The dispositive issue is whether Petitioner has established that her alleged SIRVA was sufficiently severe to be eligible for compensation under the Vaccine Act. Petitioner specifically has the burden of establishing that she suffered "residual effects" of that injury for more than six months after her vaccination. Section 11(c)(1)(D)(i).[5]

## III.    Authority

Pursuant to Vaccine Act Section 13(a)(1)(A), a petitioner must prove, by a preponderance of the evidence, the matters required in the petition by Vaccine Act Section 11(c)(1). A special master must consider, but is not bound by, any diagnosis, conclusion, judgment, test result, report, or summary concerning the nature, causation, and aggravation of petitioner's injury or illness that is contained in a medical record. Section 13(b)(1). "Medical records, in general, warrant consideration as trustworthy evidence. The records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium. These records are also generally contemporaneous to the medical events." *Cucuras v. Sec'y of Health & Hum. Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993).

Accordingly, where medical records are clear, consistent, and complete, they should be afforded substantial weight. *Lowrie v. Sec'y of Health & Hum. Servs.*, No. 03-1585V, 2005 WL 6117475, at *20 (Fed. Cl. Spec. Mstr. Dec. 12, 2005). However, this rule does not always apply. "Written records which are, themselves, inconsistent, should be accorded less deference than those which are internally consistent." *Murphy v. Sec'y of Health & Hum. Servs.*, No. 90-882V, 1991 WL 74931, *4 (Fed. Cl. Spec. Mstr. April 25, 1991), quoted with approval in decision denying review, 23 Cl. Ct. 726, 733 (1991), *aff'd per curiam*, 968 F.2d 1226 (Fed.Cir.1992)). And the Federal Circuit recently "reject[ed] as incorrect the presumption that medical records are accurate and complete as to all the patient's physical conditions." *Kirby v. Sec'y of Health & Hum. Servs.*, 997 F.3d 1378, 1383 (Fed. Cir. 2021).

The United States Court of Federal Claims has outlined four possible explanations for inconsistencies between contemporaneously created medical records and later testimony: (1) a person's failure to recount to the medical professional everything that happened during the relevant time period; (2) the medical professional's failure to

---

[5] Petitioner does not allege, nor would the evidence support, either alternative for establishing the severity requirement: that the alleged injury resulted in death or "inpatient hospitalization and surgical intervention." Section 11(c)(1)(D)(ii), (iii).

document everything reported to her or him; (3) a person's faulty recollection of the events when presenting testimony; or (4) a person's purposeful recounting of symptoms that did not exist. *La Londe v. Sec'y of Health & Hum. Servs.*, 110 Fed. Cl. 184, 203-04 (2013), *aff'd*, 746 F.3d 1335 (Fed. Cir. 2014).

The Court has also said that medical records may be outweighed by testimony that is given later in time that is "consistent, clear, cogent, and compelling." *Camery v. Sec'y of Health & Hum. Servs.*, 42 Fed. Cl. 381, 391 (1998) (citing *Blutstein v. Sec'y of Health & Hum. Servs.*, No. 90-2808, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998). The credibility of the individual offering such fact testimony must also be determined. *Andreu v. Sec'y of Health & Hum. Servs.*, 569 F.3d 1367, 1379 (Fed. Cir. 2009); *Bradley v. Sec'y of Health & Hum. Servs.*, 991 F.2d 1570, 1575 (Fed. Cir. 1993).

A special master may find that the first symptom or manifestation of onset of an injury occurred "within the time period described in the Vaccine Injury Table even though the occurrence of such symptom or manifestation was not recorded or was incorrectly recorded as having occurred outside such period." Section 13(b)(2). "Such a finding may be made only upon demonstration by a preponderance of the evidence that the onset [of the injury] . . . did in fact occur within the time period described in the Vaccine Injury Table." *Id.*

The special master is obligated to fully consider and compare the medical records, testimony, and all other "relevant and reliable evidence contained in the record." *La Londe*, 110 Fed. Cl. at 204 (citing Section 12(d)(3); Vaccine Rule 8); *see also Burns v. Sec'y of Health & Hum. Servs.*, 3 F.3d 415, 417 (Fed. Cir. 1993) (holding that it is within the special master's discretion to determine whether to afford greater weight to medical records or to other evidence, such as oral testimony surrounding the events in question that was given at a later date, provided that such determination is rational).

## IV. Finding of Fact

I make the following findings upon a complete review of the record, including all medical records and affidavits, Respondent's Rule 4(c) Report, and the parties' briefing:

- Upon receiving the subject Tdap vaccine, Megan Swanzer was forty-seven (47) years old. In the three years prior to vaccination, she consulted periodically with her primary care provider Bindu Sehgal, M.D., but Petitioner's medical history is non-contributory to the assessment of this claim. Ex. 4 at 5-32, 35-89.

- On March 4, 2018, a pharmacy employee administered the subject Tdap vaccine in or around Petitioner's right deltoid muscle. Ex. 7 at 2, 4.

- Nine days post-vaccination, on March 13, 2018, Petitioner presented to Dr. Sehgal to address right arm pain, numbness, and limited range of motion which had begun "within 6 hours" after the Tdap vaccination. Dr. Sehgal assessed Petitioner with adhesive capsulitis, for which she recommended ice, heat, home exercises, and a referral to a Dr. Gobezie for further evaluation and treatment. Ex. 4 at 33-34.

- Northshore Healthcare has billed Petitioner for a March 21, 2018, new patient appointment with Reuben Gobezie, M.D.; X-ray imaging of an unspecified shoulder; and two ultrasound-guided injections of the steroid triamcinolone acetonide to an unspecified "joint/bursa" and "tendon sheath/ligament." Ex. 9 at 1.

- Petitioner has obtained the March 21, 2018, X-ray images which are of her right shoulder. Ex. 11.

- Also on March 21, 2018, Petitioner took cell phone screen shots of the Northshore Healthcare practice location, the aforementioned X-ray images, and patient information about steroid injections. Ex. 9.

- Petitioner's best efforts were not successful in obtaining any additional medical records from the March 21st encounter.[6] However, there is sufficient contemporaneous evidence – and little to none to the contrary – to accept that Dr. Gobezie did in fact examine and administer the two steroid injections to Petitioner's right shoulder on that date, as alleged.[7]

---

[6] Dr. Gobezie and his new practice were in possession of the X-ray images, but no medical records from that date. Petitioner's subpoena onto the prior practice was returned as undeliverable. Moreover, it appears that the prior practice is no longer in operation. Ex. 12 (July 2020 search for Northshore Healthcare in the Ohio Secretary of State's business name database, which yielded no results).

[7] Despite Respondent's argument that "it is unclear whether [Dr. Gobezie] examined Petitioner in March 2018," citing the lack of comprehensive records and suggesting there may have been an undisclosed interim visit in March *2019*. Response at 4.

- Petitioner did not have any further medical encounters with Dr. Gobezie or any other provider, for either her right shoulder or any other complaints, over the next fifteen (15) months.[8]

- On May 23, 2019, Petitioner presented to Dr. Gobezie, who was then affiliated with the Cleveland Shoulder Institute, to address her "struggl[e]" with right shoulder and biceps pain. Ex. 2 at 1. Dr. Gobezie recorded that Petitioner "previously was given an injection in March for frozen shoulder, which provided temporary relief.[9] Her shoulder aches intermittently and she [has] a sharp pain across the top of her shoulder. She takes ibuprofen as needed." *Id.* On physical exam, Dr. Gobezie observed tenderness at the biceps tendon and acromioclavicular ("AC") joints; positive impingement signs; and decreased range of motion on both active and passive flexion. *Id.* at 2. Dr. Gobezie assessed Petitioner with tendinitis and osteoarthritis, for which he administered ultrasound-guided injections of the steroid triamcinolone acetonide to her right shoulder bicipital tendon and right acromioclavicular joint. *Id.* at 2-3. Dr. Gobezie discussed unspecified treatment options and instructed Petitioner to follow up as needed. *Id.* at 3.

- The next medical record in evidence is from June 25, 2020, when Petitioner presented to Let's Get Physical Therapy ("PT") to address a history of right shoulder pain which had been present since a tetanus shot "2.5 years ago." Ex. 13 at 3. Petitioner recounted that after an orthopedist first administered a cortisone injection, she was able to get "a little movement." *Id.* Afterwards, she did "a few exercises on her own," then waiting about a year before going back for a second steroid injection in May 2019. *Id.* Petitioner reported that her "full functional movement has never returned," but also that "about a month" before the PT presentation, she had developed "intense pain in the superior and later aspects of the shoulder." *Id.*

- The initial PT record also provides that an X-ray 2.5 years earlier was negative, and that Petitioner's finances were a complicating factor in addressing her injury. Ex. 13 at 3 (elaborating that "pt is self-pay").

---

[8] *See* Ex. 4 at 1 (July 9, 2019, request for "entire chart" and resulting primary care records); Petitioner's Status Report filed March 31, 2020 (ECF No. 13) (confirming that there are no outstanding medical records dating from March 21, 2018, through May 23, 2019).

[9] Respondent suggests that because the May 2019 record does not address the Tdap vaccine and references "March" without specifying the year, that there may an "interim visit to Dr. Gobezie in March *2019.*" Response at 4 (emphasis added). However, Petitioner has repeatedly denied any such visit and I do not see any other evidence that would support that prospect.

6

- During the initial PT encounter, the therapist documented right shoulder instability, painful and limited range of motion, slight weakness (at 4/5), a positive impingement sign, and generalized tenderness. Ex. 13 at 3-4. The therapist summarized that Petitioner had "significant functional limitation" in her dominant right shoulder, and that the presentation was "consistent with the 'thawing' phase of adhesive capsulitis. *Id.* at 5.

- Petitioner made significant progress after six PT encounters. On July 28, 2020, she self-discharged from formal PT with the plan to continue her home exercise program ("HEP"). Ex. 13 at 30-31.

- Petitioner has submitted four affidavits, in which she maintains that her shoulder injury was continuous and sufficiently severe to be considered under the Vaccine Program. Exs. 1, 6, 10, 14.

- In her second affidavit (dated March 31, 2020), Petitioner recalls that on March 21, 2018, Dr. Gobezie administered the first cortisone injections to her right shoulder and told her that only one more round would be possible. Ex. 6 at ¶ 5. Petitioner recalls waiting "as long as she could between injections because [she] was afraid of getting the second one too soon and then having it not work." *Id.* In the interim, she self-treated her shoulder with heat, ice, Motrin, and a home exercise program. *Id.* at ¶ 6.

- Petitioner recalls that after the May 23, 2019, follow-up appointment with Dr. Gobezie, she again tried to manage her persistent shoulder pain. Ex. 6 at ¶ 8. She delayed seeking physical therapy while she assisted with her father-in-law, who passed away in late 2019 or early 2020. *Id.* at ¶ 12. She further delayed physical therapy during the initial COVID-19 pandemic restrictions. *Id.* at ¶ 1.

- Petitioner emphasizes that she did not suffer any injury to her right shoulder or arm either before the subject vaccination or between the recorded medical encounters. She maintains that all treatment she received in 2018, 2019, and 2020 was directly related to and caused by the vaccination. Ex. 14 at ¶¶ 10-12.

Respondent asserts that there is not preponderant evidence to show that Petitioner's shoulder injury in March 2018 led to the sequelae observed in May 2019. Response at 5. Certainly, there is a substantial treatment gap in this case, which

reasonably allows for the possibility that *other* intervening issues or factors could be causal of symptoms experienced in the interim.

At the same time, however, the contemporaneous treatment records from the period close-in-time to vaccination support the conclusion that Petitioner *did* experience a SIRVA injury consistent with other aspects of the Table claim's requirements. Thus, and while I recognize that there is limited available documentation of Dr. Gobezie's first consult, Respondent gives insufficient consideration to the primary care records created just eight days earlier. Specifically, on March 13, 2018, Dr. Sehgal recorded her objective findings of right shoulder pain and limited range of motion, which she assessed as adhesive capsulitis. Dr. Gobezie's objective findings and assessment in May 2019 – and moreover, the PT assessment in summer 2020 – were consistent. And Respondent has not identified, nor do I see support, for any other inciting event or new injury.

As I have previously noted in other cases – and at the July 2020 status conference here – the limited medical records and admitted gaps in treatment are relevant to the extent of damages Petitioner may reasonably claim. Certainly Petitioner should not expect a significant pain and suffering award in this case, having lived with her injury for fifteen months without treatment. Regardless, there is preponderant evidence that Petitioner suffered the residual effects of her alleged injury – specifically, mild to moderate pain and reduced range of motion - for more than six months after vaccination.

## V.     Other Table Requirements and Entitlement

In light of the lack of other objections and my own review of the record, I find that Petitioner has established the other requirements for a Table SIRVA claim. Specifically, the record does not reflect a history of prior right shoulder pathology that would explain Petitioner's post-vaccination injury. 42 C.F.R. § 100.3(c)(3)(10)(i). There is no evidence of any other condition or abnormality that represents an alternative cause. 42 C.F.R. § 100.3(c)(3)(10)(iii). The shoulder pain began within forty-eight (48) hours after vaccination. 42 C.F.R. §§ 100.3(a), (c)(3)(10)(ii). The pain and reduced range of motion were limited to the shoulder. C.F.R. § 100.3(c)(3)(10)(iv). The contemporaneous vaccine administration record reflects the site of administration as the right deltoid. Ex. 7 at 2, 4; Sections 11(c)(1)(A) and (B)(i). Petitioner has not pursued a civil action or other compensation. Ex. 1 at ¶ 12; Section 11(c)(1)(E). Thus, Petitioner has satisfied all requirements for entitlement under the Vaccine Act.

### VI. Conclusion and Damages Order

Based on the entire record, I find that Petitioner has provided preponderant evidence satisfying all requirements for a Table SIRVA. Petitioner is entitled to compensation. **Thus, this case is now in the damages phase.**[10]

**By no later than Monday, March 21, 2022, Petitioner shall file a status report updating me on the parties' progress towards informally resolving damages. The status report shall indicate the date by which Respondent responded to Petitioner's September 11, 2020, demand. If Respondent has not yet responded, the parties shall confer, and Petitioner shall report the date by which Respondent expects to respond.**

**IT IS SO ORDERED.**

<u>s/Brian H. Corcoran</u>
Brian H. Corcoran
Chief Special Master

---

[10] The parties are reminded that in Vaccine Act cases, damages issues are typically resolved collaboratively. Therefore, the parties should begin actively discussing the appropriate amount of compensation in this case. In many cases, damages can be resolved by Petitioners communicating a demand to Respondent, who may agree to the demand or may make a counter-offer.

The parties shall not **retain a medical expert, life care planner, or other expert without consulting with each other and the Chief Special Master.** If counsel retains an expert without so consulting in advance, reimbursement of those costs may be affected.